IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEPHAN CORDOVA,

      Plaintiff,

v.                                     Civ. No. 11-806 GBW/ACT

CITY OF ALBUQUERQUE,
RAY SCHULTZ, CARLOS ARGUESTA,
AARON HEYMAN, MATTHEW
HOISINGTON, KEVIN KEES,
JAMES FOX, and KENNETH NEIBERGER,

      Defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON COUNT I OF PLAINTIFF'S COMPLAINT

      This matter comes before the Court on the City Defendants' Motion for Partial Summary Judgment No. I on the Unlawful Seizure Claim in Count I of the Complaint and the Corresponding Municipal Liability Claim in Count VII, *doc. 57*.  The Court, being fully advised by the parties, *see docs. 62 & 67*, finds that the motion is well-taken and grants it.

I.    BACKGROUND

      On July 30, 2008, Albuquerque Fire Department paramedics responded to a 911 call for medical assistance at Plaintiff's mother's residence on Mesa Arriba Ave. NE. *Doc. 1*, ex. A ¶ 4; *Doc. 57* ¶ 6.  When they arrived, Plaintiff's sister-in-law Kristen Cordova informed them that Plaintiff did not want medical assistance and that he had a

gun.  *Doc. 1*, ex. A ¶ 6; *Doc. 57* ¶ 4.  The paramedics immediately left the house and called dispatch.  *Doc. 1*, ex. A ¶ 7; *Doc. 57* ¶ 5.  Soon after the police arrived, Plaintiff exited the house and was confronted by the police.  *Doc. 1*, ex. A ¶ 13; *Doc. 57* ¶ 13.  At some point during the ensuing altercation, Plaintiff was shot.  *Doc. 1*, ex. A ¶ 18; *Doc. 57* ¶ 25-26.  On the day of the shooting, Defendant Aaron Heyman requested and received an arrest warrant for Plaintiff based on the allegation that Plaintiff pointed a gun at officers during the aforementioned confrontation.  *Doc. 1*, ex. A ¶ 21.

Plaintiff was hospitalized and underwent emergency surgery at the University of New Mexico Hospital.[1]  *Id*. ¶ 22.  Plaintiff alleges that Defendants Heyman and Carlos Argueta prevented his family from visiting him at the hospital from July 31, 2008 to August 4, 2008.  *Id*.  Plaintiff further alleges that Defendant Heyman attempted to obtain a statement from Plaintiff on August 4, 2008 while he was still convalescing.  *Id*. ¶ 25.  Plaintiff remained hospitalized until August 20, 2008 when he was transported to the Metropolitan Detention Center (MDC), allegedly in violation of a court order.  *Id*. ¶ 39.  Plaintiff's family bonded Plaintiff out of MDC on August 22, 2008.  *Id*. ¶ 41.  During his time at MDC, Plaintiff allegedly did not receive adequate medical care and had to return to the hospital immediately upon release.  *Id*. ¶¶ 42-43.

---

[1] As the instant motion concerns only the events prior to the shooting, the Court provides an abbreviated description of the events thereafter.  These events will be discussed in greater depth in this Court's rulings on Defendants' and Plaintiff's pending motions for summary judgment on Counts V and VI of Plaintiff's complaint.  *See docs. 75, 76, 77, 78, 79*.

Plaintiff initially filed suit against Defendants in state court.  *See doc. 1.*

Defendants removed the case to this Court on September 8, 2011.  *Id*.  Plaintiff brings

seven counts under 42 U.S.C. § 1983: (1) unlawful seizure under the Fourth

Amendment; (2) use of excessive force under the Fourth Amendment; (3) violation of

Plaintiff's right of association under the First Amendment; (4) violation of his right to

counsel under the Sixth Amendment; (5) violation of his right to bail and due process

under the Fourteenth Amendment; (6) wrongful prosecution; and (7) municipal liability

for the unlawful seizure, First Amendment violations, and wrongful prosecution.  *Doc.

1*, ex. A ¶¶ 43-73.  The parties have since stipulated to the dismissal of Count IV.  *Doc.

66.*  The instant motion seeks summary judgment only as to Count I of the complaint.[2]

*Doc. 57.*

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

movant bears the initial burden of "show[ing] that there is an absence of evidence to

---

[2] Although his complaint indicates otherwise, *doc. 1*, ex. A ¶ 73, Plaintiff states in his response to Defendants' motion that his municipal liability claim in Count VII does not allege that Defendant City of Albuquerque's policies were a moving force behind Plaintiff's alleged seizure.  *Doc. 62* at 1.  In any event, as the Court herein dismisses Count I of Plaintiff's complaint because of the lack of a constitutional violation, there can be no municipal liability on the basis of the seizure alleged in Count I.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  Therefore, to the extent they are made, the Court also dismisses any claims against Defendant City of Albuquerque arising out of the allegations in Count I of Plaintiff's complaint.

support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  *See Celotex Corp.*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).  All material facts set forth in the motion and response which are not specifically controverted are deemed undisputed. D.N.M.LR-Civ. 56.1(b).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  *See Liberty Lobby*, 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999).  Third, the court cannot decide any issues of credibility.  *See Liberty Lobby*, 477

U.S. at 255.  "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor."  *Id*. at 257.

**III.   U̲N̲D̲I̲S̲P̲U̲T̲E̲D̲ F̲A̲C̲T̲S̲**

1. On July 30, 2008, Plaintiff was at his mother's house on Mesa Arriba Avenue NE in Albuquerque, New Mexico.  *Doc. 1, ex. A ¶ 4; Doc. 57 ¶ 1.*

2. Plaintiff was vomiting and complaining that his "heart hurt."  *Doc. 57 ¶ 3 & ex. B at 88; Doc. 62 ¶ 1-3.*

3. Plaintiff called his girlfriend, Yvette Gurule, and requested that she pick him up at the house and drive him to the hospital. *Doc. 62 ¶¶ 1-3; Doc. 64, ex. A at 214-15 & ex. B at 74-75; Doc. 67 at 4.*

4. Plaintiff's sister-in-law, Kristen Cordova, called 911 and requested medical assistance for Plaintiff.  *Doc. 57 ¶ 2; Doc. 62 ¶¶ 1-3; Doc. 64, ex. A at 89.*

5. When the paramedics arrived, Kristen told at least one of them that Plaintiff did not want their help and that he had a gun.  *Doc. 57 ¶ 4; Doc. 62 ¶ 4; Doc. 64, ex. A at 90.*

6. The paramedics immediately left the house and contacted dispatch.  *Doc. 57 ¶ 6 & ex. A at 78; Doc. 62 ¶ 1-3.*

7. Dispatch sent Albuquerque Police Department (APD) officers to Plaintiff's house. *Doc. 57 ¶¶ 6-7 & ex. C at 91; Doc. 62 ¶¶ 1-3.*

8. Dispatch told the APD officers that a man was suffering from a medical emergency, refusing medical assistance, and in possession of a gun. *Doc. 57* ¶ 6 & ex. A at 78; *Doc. 62* ¶¶ 1-3; *Doc. 67* at 4.

9. When the police arrived, they parked their vehicles on either end of Plaintiff's block to prevent access to the street. *Doc. 62* ¶ 7; *Doc. 64*, ex. A at 18, 36, 57; *Doc. 67* at 4.

10. Plaintiff's girlfriend, Yvette Gurule, was unable to access Plaintiff's street when she arrived to pick him up. *Doc. 62* ¶ 7 & ex. B at 77; *Doc. 67* at 4.

11. The police asked Plaintiff's family members to exit the house. *Doc. 57* ¶ 7 & ex. B at 92; *Doc. 62* ¶ 7.

12. Kristin Cordova and other members of Plaintiff's family told the police that Plaintiff had not threatened anyone. *Doc. 57* ¶ 8 & ex. C at 60; *Doc. 62* ¶¶ 7-8; *Doc. 64*, ex. E at 9.

13. Kristin Cordova spoke with Sergeant James Fox about Plaintiff's medical condition. *Doc. 57* ¶¶ 8-9 & ex. C at 60; *Doc. 62* ¶ 9; *Doc. 64*, ex. D at 88.

14. Sergeant Fox received Plaintiff's cell phone number from Plaintiff's brother. *Doc. 57* ¶ 12, ex. C at 61-62; *Doc. 62* ¶ 12; *Doc. 64*, ex. F at 10-11.

15. The police instructed Plaintiff's family to wait in a car. *Doc. 62* ¶ 13; *Doc. 64*, ex. A at 62; *Doc. 67* at 4.

16. Plaintiff exited the house through the front door and walked toward his car. *Doc. 57* ¶ 13 & ex. B at 94; *Doc. 62* ¶ 13; *Doc. 64*, ex. A at 62.

6

17. Plaintiff's gun was in the right front pocket of his pants. *Doc. 57* ¶ 14 & ex. D at 222; *Doc. 62* ¶ 14.  The butt of the gun was exposed. *Doc. 62* ¶ 14; *Doc. 64*, ex. A at 141; *Doc. 67* at 4.

18. At the time he exited the house, Plaintiff was not suspected of a crime. *Doc. 62* ¶ 14; *Doc. 64*, ex. G at 52; *Doc. 67* at 4.

19. While walking to his car, Plaintiff noticed several APD vehicles at the end of the block. *Doc. 57* ¶ 15 & ex. D at 215; *Doc. 62* ¶ 15. Plaintiff did not know that the police had been called to assist him and did not see any individual officers. *Doc. 57* ¶ 15 & ex. D at 215; *Doc. 62* ¶ 15.

20. At some point thereafter, APD officers approached Plaintiff, drew their guns, and trained their guns on Plaintiff. *Doc. 62* ¶¶ 17-18; *Doc. 64*, exs. H at 41, A at 127, I at 10; *Doc. 67* at 5.

21. Plaintiff then walked backwards. *Doc. 62* ¶ 17; *Doc. 64*, exs. A at 20-21, 127, 139, G at 48, H at 40-41, I at 12, 15, J at 31; *Doc. 67* at 5.  The officers followed him, continuing to train their guns on him. *Doc. 62* ¶ 17; *Doc. 64*, exs. A at 20-21, 127, 139, G at 48, H at 40-41, I at 12, 15, J at 31; *Doc. 67* at 5.

22. Sergeant Fox told Plaintiff that the police wanted to help him. *Doc. 57* ¶ 18 & exs. F at 2, H at 17; Doc. 62 ¶ 18.  Sergeant Fox asked Plaintiff where he wanted to go and asked him to sit down and talk.  *Doc. 57* ¶ 18 & exs. F at 2, H at 17; *Doc. 62* ¶ 18.

23. Plaintiff told the officers to leave him alone. Doc. 57, exs. F at 3, H at 18; *Doc. 62* ¶ 18; Doc. 64, ex. A at 21; *Doc. 67* at 6.

24. Plaintiff appeared to not understand what was happening. *Doc. 57* ¶ 20, exs. K at 139-40, L at 58-59; *Doc. 62* ¶ 20.  Plaintiff appeared to falter at certain points and looked like he might collapse.  *Doc. 57* ¶ 20 & exs. J at 21, L at 58-59; *Doc. 62* ¶ 20.

25. Sergeant Fox stated that he drew a mental line behind Plaintiff as Plaintiff walked backwards that he was not going to allow Plaintiff to cross. *Doc. 62* ¶ 25; *Doc. 64*, ex. G at 48; *Doc. 67* at 4.

26. At some point, Plaintiff put his hands up. *Doc. 57* ¶ 24 & exs. D at 221, E at 15; *Doc. 62* ¶¶ 22-24; *Doc. 64*, ex. I at 17.

27. Witnesses did not see weapons in Plaintiff's hands immediately prior to the police officers shooting him or as he was shot. *Doc. 62* ¶ 24; *Doc. 64*, exs. H at 44, I at 25, 27-29, J at 47, K at 42; *Doc. 67* at 5.

28. Plaintiff felt a blow to the back of his neck. *Doc. 57* ¶ 25, exs. D at 215, 222-23; *Doc. 62* ¶ 25.

29. At least one witness saw Plaintiff's gun in his pocket while he was lying on the ground after being shot. *Doc. 62* ¶ 25; *Doc. 64*, ex. A at 144; *Doc. 67* at 4.

30. Approximately two minutes elapsed from the time Plaintiff exited the house to the time he was shot. *Doc. 57* ¶ 26; *Doc. 62* ¶ 26.

**IV.   <u>ANALYSIS</u>**

In Count I of his complaint, Plaintiff alleges that he was seized in violation of the Fourth Amendment "when Defendant Fox and others brandished weapons at him and prevented him from entering his car and going about his freedom of movement."[3] *Doc. 1*, ex. A ¶ 45. Plaintiff argues that the alleged seizure was unreasonable because "there was no probable cause to believe [Plaintiff] had committed a crime or that he was violent." *Id*. ¶ 46. In response, the individual Defendant police officers involved in the shooting—Matthew Hoisington, Kevin Kees, and James Fox ("Defendant Officers")—argue that they have qualified immunity from Plaintiff's claim because (1) in the period of time before Plaintiff was shot, Defendant Officers never seized Plaintiff, and (2) even if Plaintiff was seized, that seizure was reasonable and therefore not a violation of the Fourth Amendment. *Doc. 57* at 3-4. The Court agrees with Defendant Officers' analysis and finds that they are entitled to qualified immunity from Count I of Plaintiff's complaint.

## A.  Qualified immunity standard

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a defendant asserts

---

[3] The instant motion addresses only Count I of Plaintiff's complaint, which deals solely with the events that occurred before Plaintiff was shot. *Doc. 1*, ex. A ¶¶ 43-46. The shooting itself is the subject of Plaintiff's second count alleging that Defendants used excessive force, *id*. ¶¶ 47-49, and is not at issue in this motion. *See doc. 57* at 15 n.9.

qualified immunity at the summary judgment stage, the burden shifts to the plaintiff who must clear two hurdles to defeat the defendant's motion.  The plaintiff must demonstrate, on the facts alleged, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity." *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (citations omitted).

## B. Defendants have qualified immunity because they did not violate Plaintiff's Fourth Amendment rights in the events that occurred prior to the shooting

In order to overcome Defendant Officers' assertion of qualified immunity, Plaintiff must show that Defendant Officers violated his rights under the Fourth Amendment by engaging in an unreasonable seizure.  Because Plaintiff fails to meet this burden, even when all inferences are drawn in his favor, Defendant Officers are entitled to qualified immunity.

### 1. *Plaintiff was not seized during the events that preceded the shooting*

#### a. The applicable law

The Fourth Amendment prohibits unreasonable seizures by law enforcement officers.  U.S. Const. amend. IV.  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement."  *Brendlin v. California*, 551 U.S. 249, 254 (2007) (omitting internal

10

quotations).  Seizure by show of authority requires that the person submit to the assertion of authority.  *California  v. Hodari D.*, 499 U.S. 621, 626 (1991).

At issue in this case is the submission requirement.[4]  The test for determining whether a person has submitted to a show of authority is objective; it asks whether a reasonable law enforcement officer would have thought that the person submitted. *United States v. Salazar*, 609 F.3d 1059, 1065 (10th Cir. 2010).  A reasonable law enforcement officer is one who is "prudent, cautious, and trained."  *Id.*

The Tenth Circuit has found that when a person fails to comply with an officer's instructions, he has not submitted to authority.  *See, e.g., United States v. Martin*, 613 F.3d 1295, 1298, 1301 (10th Cir. 2010) (finding that Mr. Martin was not seized when a police officer told him to turn around and put his hands on the wall and he instead turned around and put his hands out of sight of the officer); *United States v. Harris*, 313 F.3d 1228, 1231-32 (10th Cir. 2002) (finding Mr. Harris was not seized when a police officer asked for identification and he kept walking away from the officer);  *United States v. Carroll*, No. 11-2181, slip op., 2012 WL 3186838, at *1 (10th Cir. Aug. 7, 2012) (finding that Mr. Carroll was seized only when he complied with a police officer's third instruction to sit down).

A person's motives for refusing to submit to a show of authority are irrelevant to the submission analysis, no matter how rational and reasonable they may be.  *Reeves*

---

[4] Defendant Officers concede that they engaged in a show of authority when they trained their guns on Plaintiff.  *Doc. 57* at 15.

*v. Churchich*, 484 F.3d 1244, 1253 (10th Cir. 2007) (holding that plaintiffs were not seized when they disobeyed police instructions even though their noncompliance was reasonable).

### b.  Plaintiff was not seized

The facts in this case, even when construed in favor of Plaintiff, indicate that Plaintiff did not submit to Defendant Officers' show of authority in the events preceding the shooting and therefore was not seized.  The confrontation between Plaintiff and Defendant Officers was captured on the belt tapes of Defendants Kees and Hoisington. The belt tapes recorded the following exchange:

> Unidentified officer: John[5], John, listen to me. I just want to help you. Okay? Just sit down. Okay?
>
> Unidentified officer: Get your hands off the gun.
>
> ***
>
> Unidentified officer: John, do me a favor. We're not going to approach you anymore. Just sit down. I want to talk to you. I just want to talk to you. Please. John, hear me out. I'm not going to make you go anywhere you don't want to go. I'm not going to make you go anywhere you don't want to go. Please. Will you please sit down? Sit down for me, please. John, I want to help you. John, do me a favor. Sit down. John, please sit down. John, do me a favor. Sit down. I want to help you.
>
> ***

---

[5] Defendant Officers called Plaintiff John throughout the confrontation, despite the fact that his name, as far as the Court is aware, is Stephan Cordova.  *See Doc. 57*, exs. F at 2-3, H at 17.  Neither party has explained whether John is Plaintiff's nickname, middle name, or otherwise.  Because Plaintiff does not allege that Defendant Officers were calling him by an incorrect name, the Court will assume, based on Plaintiff's response to the Defendant Officers, that Plaintiff understood that the Officers were referring to him when they used the name "John."

> Unidentified officer: Do me a favor. I need you to stop where you're – there are some other officers are over here. Come over here. John, please. Listen to me. John. What can I do for you? Talk to me.
>
> Plaintiff: Leave me alone.
>
> Unidentified officer: Okay. But you got to understand something. If I leave you alone, where are you going to go? John, where are you going to go?
>
> [Unidentified noise sounding like a firecracker or shot fired]
>
> Unidentified officer: John, drop the gun.
>
> [Shots fired]

*Doc. 57*, ex. F at 2-3.  The transcript of Defendant Officer Hoisington's belt tape, as merged with dispatch, also indicates that an unidentified officer told Plaintiff to "Put your hands in the air, man."  *Id.*, ex. H at 17.

Thus, during the confrontation, the officers instructed Plaintiff to sit down, get his hands off his gun, stop, and put his hands in the air.  The undisputed facts indicate that Plaintiff did not comply with at least two of these commands: throughout the confrontation, Plaintiff continued to walk backwards and away from the officers.  *Doc. 62* ¶ 17; *Doc. 67* at 5.  He did not sit down and, while he might have briefly paused, he did not stop walking.[6]

---

[6] Plaintiff argues that he "had come to a complete stop" immediately before he was shot.  *Doc. 62* ¶ 24.  In support of that contention, Plaintiff cites the Grand Jury testimony of Defendant Kees and the deposition of Robert Bates, an eyewitness.  However, neither of these sources support the allegation that Plaintiff had stopped right before he was shot.  Defendant Kees stated that Plaintiff stopped walking when a

The parties dispute whether Plaintiff complied with the officers' instructions to put his hands up or to keep his hands off of his gun.  They agree that Plaintiff raised his hands at some point during the incident, but Plaintiff contends he did so immediately when first confronted by the police while Defendants suggest he raised them sometime later.  *Doc. 57* ¶ 24; *Doc. 62* ¶¶ 22-24.  Witnesses also disagree about the position of Plaintiff's hands throughout the incident: some said his arms hung straight down at his sides, *doc. 64*, ex. A at 128, 139, 141, while others said he turned his palms outward as though questioning the officers, showing that his hands were empty, or gesturing that he wanted to be left alone, *id.*, exs. A at 141, J at 46, H at 44.  Still others say his hands were raised.  *Id.*, ex. I at 10, 17-18.

The parties also disagree as to whether Plaintiff ever put his hand in his right front pocket, where he had placed his gun.  At least one witness said that Plaintiff reached for his pocket during the incident.  *Doc. 57*, ex. L at 65.  Defendant Officer Hoisington claims that Plaintiff put his hand in his pocket and pulled out the gun so that he could see the handle.  *Doc. 64*, ex. A at 20.  Other witnesses claim Plaintiff never touched his hips or pockets.  *Id.*, exs. I at 19, J at 45.

---

firecracker went off.  *Doc. 64*, ex. A at 44.  Rather than remaining still, Plaintiff "change[d] his direction of travel.  He now headed south to the sidewalk and started up the sidewalk/driveway into another residence."  *Id*.  The portion of Mr. Bates' deposition cited by Plaintiff says nothing about whether Plaintiff ever stopped.  *See doc. 64*, ex. I at 17.  In fact, when pressed on the moments leading up to the shooting, Mr. Bates testified that Plaintiff "was backing up with his arms raised."  *Id*. at 22.

Resolving these disputes in favor of Plaintiff and assuming that Plaintiff had his hands raised throughout the incident and never reached for his pocket, the facts still do not show that Plaintiff was seized by Defendant Officers because Plaintiff never submitted to Defendants' show of authority. A Fourth Amendment seizure is premised on the termination or restraint of a person's movement. *Brendlin v. California*, 551 U.S. 249, 254 (2007). Even if Plaintiff complied with the officers' commands to put his hands in the air and keep his hands away from his gun, he did not stop or sit down despite numerous requests to do so. *See doc. 57*, ex. F at 2-3. From the perspective of a reasonable, prudent, and cautious officer, Plaintiff's continued movement does not suggest submission. Rather, by continuing to back away from the officers, Plaintiff did the opposite of what the officers told him to do (sit down) at least seven times. *See doc. 57*, ex. F at 2.

The fact that Plaintiff's conduct was not aggressive or overtly evasive does not alter the analysis. In *United States v. Salazar*, a police officer activated his patrol lights and drove toward Mr. Salazar's truck. 609 F.3d 1059, 1062 (10th Cir. 2010). In response, Mr. Salazar slowly backed up, away from the patrol car. *Id*. The Tenth Circuit held Mr. Salazar did not submit to the officer's authority when he backed up because a reasonable officer could well have viewed Mr. Salazar's conduct as "a nascent attempt to flee, an effort to buy time . . ., or simply a period of indecision before he determined what to do." *Id*. at 1067.

Similarly, in *United States v. Carroll*, a suspect twice rebuffed a police officer's request to sit down on the curb and instead backed away from the officer toward his car. 2012 WL 3186838, at *1. He did not threaten the officer or produce a weapon. *Id.* Nevertheless, the court found that the suspect was not seized until he complied with the officer's third instruction to sit down on the curb. *Id.* at *2.

The facts taken together support a similar analysis here. Even assuming Plaintiff had his hands raised during the entire incident and never reached for his gun, a reasonable officer, faced with Plaintiff walking backwards in spite of orders to sit down, would not know whether Plaintiff's actions were benign or intentionally defiant. As the Tenth Circuit noted in *Salazar*, Plaintiff's behavior could signal a potential attempt to flee or to buy time to reach for his weapon. Plaintiff's continued movement might also lead a reasonable officer to question whether he was backing toward something in particular, such as another weapon or an escape route. Although Defendant Officer Kees said that Plaintiff briefly stopped walking when he heard a firecracker, a seizure requires that "a suspect . . . do more than halt temporarily; he must submit to police authority" *Carroll*, 2012 WL 3186838, at *2 (quoting *Salazar*, 609 F.3d at 1066).

Plaintiff's brief conversation with Defendant Officers also indicates that he had not submitted. Plaintiff did not respond to the officers' initial attempts to engage him in conversation. *Doc. 57*, ex. F at 2. When he finally did respond, it was only to say "leave me alone." *Id.*, ex. F at 3. A reasonable officer would not view that single statement as

16

indicative of a yielding to the officers' show of authority.  *Salazar*, 609 F.3d at 1068 (noting that whether an attempt at conversation could be viewed as submission to a show of authority depends on what a reasonable officer would have thought of the statements).

The parties agree that during the incident Plaintiff appeared not to understand what was happening and faltered at certain points, looking as though he might collapse.  *Doc. 57 ¶ 20*; *Doc. 62 ¶ 20*.  Although Plaintiff would construe his confusion and stumbling to suggest that he was clearly non-threatening, a reasonable officer might well be concerned that his behavior appeared erratic and unpredictable.  More importantly, a non-threatening demeanor does not show submission unless a person also complies with police instructions.  Because Plaintiff failed to comply with Defendant Officers' commands to stop and sit down, he was not seized.

### 2.   *Even if Plaintiff was seized, the seizure was reasonable*

#### a.   The applicable law

A seizure is only a violation of the Fourth Amendment if it is unreasonable.  U.S. Const. amend IV.  There are two types of seizures of a person: a brief, investigatory stop (a "*Terry* stop") and an arrest.  The former is reasonable if an officer has reasonable suspicion that a person is involved in criminal activity and the scope of the stop is "reasonably related . . . to the circumstances which justified the interference in the first place."  *Terry v. Ohio*, 392 U.S. 1, 20 (1968).  The latter is reasonable only if the officer has

probable cause that the person seized committed or intends to commit a crime.  *United States v. Watson*, 423 U.S. 411, 417 (1976).  Reasonable suspicion is a lower standard than probable cause: it requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop.  *Terry*, 392 U.S. at 21. In contrast, probable cause requires facts and circumstances which are sufficient to convince a reasonable person that the suspect committed a particular offense.  *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009).  Reasonable suspicion and probable cause "are not finely-tuned standards"; "[t]hey are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed."  *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotations omitted).

Seizures do not take place only in the context of criminal activity.  The Tenth Circuit has recognized that, as part of his or her community caretaking duties, "a police officer may have occasion to seize a person . . . in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity."  *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993).  Such seizures are subject to the same reasonable suspicion and probable cause requirements as criminal seizures, but instead of suspecting the person of involvement in crime, the officer must suspect that the person is a threat to the safety of the public and/or him/herself.  *See Anaya v. Crossroads Managed Care Sys.*, Inc., 195 F.3d 584, 591 (10th Cir. 1999) (holding that seizure of an

18

intoxicated person for purposes of detoxification is reasonable only if the officer has "probable cause to believe [the] intoxicated person is a danger to himself or others."). "[A] reviewing court [must] balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference."  *King*, 990 F.2d at 1560.

### b. Defendant Officers had reasonable suspicion that Plaintiff could be a danger to himself and others

Even if the encounter between Defendant Officers and Plaintiff constituted a seizure, that seizure was reasonable and therefore not a violation of the Fourth Amendment.  The facts in this case show that Defendant Officers had reasonable suspicion that Plaintiff posed a danger to himself and others by behaving erratically while in possession of a weapon and refusing medical assistance in spite of his apparent need.  Thus, they had a sufficient basis to briefly seize Plaintiff to further investigate their suspicion.  *See Terry*, 392 U.S. at 21.

Several specific and articulable facts support Defendant Officers' suspicion that Plaintiff potentially posed a danger to himself and others.  Defendant Officers knew that Plaintiff was suffering from a medical emergency and that he was refusing medical treatment.  *Doc. 57* ¶ 6; *Doc. 62* ¶¶ 1-3; *Doc. 67* at 4.  They could see that he looked confused and ill: Plaintiff stumbled and appeared as though he might collapse. *Doc. 57* ¶ 20; *Doc. 62* ¶ 20.  Both Defendant Officers and witnesses describe Plaintiff as clutching his chest, sweating, and at times closing his eyes and dropping his chin to his chest. *Doc.*

*64*, exs. A at 21, F at 16; *Doc. 57*, ex. L at 58.   When Defendant Officers attempted to communicate with Plaintiff, Plaintiff was initially nonresponsive.  *Doc. 57*, ex. F at 2-3. Defendant Officers also knew that Plaintiff had a gun.  *Doc. 57* ¶ 6; *Doc. 62* ¶¶ 1-3.

This case resembles *United States v. Garner*, in which an officer was called to assist Mr. Garner who had been seen sitting, slumped over in a field for several hours.  416 F.3d 1208, 1211 (10th Cir. 2005).  When the officer approached, Mr. Garner began to walk away.  *Id*.  The officer told him to come back and sit down so the fire department personnel could examine him.  *Id*.  The Tenth Circuit held that the officer was exercising a legitimate community caretaking function when he ordered Mr. Garner to return for an examination and that he had reasonable suspicion to support his conclusion that Mr. Garner needed medical assistance based on the fact that Mr. Garner was seen unconscious and slumped over for several hours.  *Id*. at 1214.   The Court also found that because he appeared in need of medical care, the government's interest in protecting Mr. Garner outweighed his interest in being free from arbitrary interference. *Id*. at 1215.

Like the officer in *Garner*, Defendant Officers were exercising their community caretaking function when they seized Plaintiff.  Plaintiff, like Mr. Garner, was visibly unwell. *See doc. 57* ¶ 20; d*oc. 62* ¶ 20.   Because he was refusing medical care, Defendants had reasonable suspicion that he was a danger to himself.  *See doc. 57* ¶ 6; *doc. 62* ¶¶ 1-3; *doc. 67* at 4.  Unlike in *Garner*, Defendant Officers also knew that Plaintiff had a gun.  *Id*.

Given his erratic behavior and non-responsiveness to their commands, Defendant

Officers had reasonable suspicion that Plaintiff could pose a danger to others.  Although

the interference with Plaintiff's liberty—ordering him stop and sit down at gunpoint—

was more extensive than that in *Garner*, the government's interest was stronger since

Plaintiff was potentially a threat to both himself and others.

 Having determined that Defendant Officers had reasonable suspicion to support

a brief seizure of Plaintiff, the question becomes whether the seizure was reasonably

related in scope to its justification—protecting Plaintiff and the other people around

him.  *See Terry*, 392 U.S. at 20.  Plaintiff contends that Defendant Officers' use of

weapons in the encounter was unreasonable, given that Plaintiff was in the midst of a

medical emergency and Plaintiff's family had told the officers that Plaintiff had not

threatened anyone.  *Doc. 62* at 12.

 "[P]olice officers are not required to use the least intrusive means in the course of

a detention."  *King*, 990 F.2d at 1562.  However, the means they use must be reasonable

in light of the circumstances.  *Id*. at 1563.  "[T]he use of a gun does not in and of itself

make an encounter an unlawful seizure."  *Lundstrom v. Romero*, 616 F.3d 1108, 1121 (10th

Cir. 2010).  "[T]he use of guns in connection with a stop is permissible where the police

reasonably believe the weapons are necessary for their protection."  *Id*. (quoting *United

States v. Neff*, 300 F.3d 1217, 1220 (10th Cir.2002)).  To determine whether the use of guns

was reasonable, the Court looks to the totality of the circumstances as viewed from the perspective of a reasonable officer on the scene. *Id*.

In *Lundstrom v. Romero*, the Tenth Circuit found that a police officer effected a reasonable seizure when she drew her gun and "kept it pointed at Lundstrom only for so long as necessary to determine he was not armed." 616 F.3d 1108, 1122 (10th Cir. 2010). The court found that the officer's concern for her safety was reasonable since her conversation with Mr. Lundstrom had escalated and she could not see his hands. *Id*. Similarly, the Tenth Circuit found in *Thomas v. Durastanti* that the drawing of weapons was reasonable when officers approached people they believed were fugitives who had been driving a stolen car in a reckless manner away from a high crime area. 607 F.3d 655, 668 (10th Cir. 2010).

While Defendant Officers might have taken a different tack and, as Plaintiff suggests, attempted to approach him without their guns drawn, it is not for this Court to second-guess the methods used by the police so long as those methods are objectively reasonable.[7] *See King*, 990 F.2d at 1562. In light of the totality of the circumstances, a reasonable officer might well have thought that Plaintiff posed a threat to the safety of those around him and that guns were necessary for protection. Unlike the police officer in *Lundstrom*, Defendant Officers knew that Plaintiff was armed. Although Plaintiff's

---

[7] Because the instant motion addresses only the events that occurred prior to the shooting, the Court's analysis of whether Defendant Officers' use of guns was reasonable extends only to the drawing and pointing of those weapons at Plaintiff. This order does not address whether it was reasonable for Defendant Officers to fire their weapons at Plaintiff.

family members had told Defendant Officers that Plaintiff had not threatened anyone, given Plaintiff's erratic behavior and noncompliance with police commands to sit down and stop, the use of guns was not unreasonable.

As the Tenth Circuit made clear in *Thomas*, an officer's belief does not have to be correct to render his use of a weapon reasonable.  607 F.3d at 663-64.  The officers in that case incorrectly assumed that a car recklessly speeding away from a high crime area without a license plate was a stolen vehicle and that its occupants were fugitives. *Id*. at 660-61.  Yet the court found their use of guns during the stop reasonable because, in light of the available facts, a reasonable officer would conclude that a gun was necessary for protection.  *Id*. at 668.  Here too Defendant Officers' conclusion that Plaintiff was potentially a danger to himself and others was reasonable, even if not accurate.

While a seizure that exceeds that limits imposed by *Terry* becomes an arrest that must be justified by probable cause, the methods used and length of the seizure at issue here—the period in which the police pointed their weapons at Plaintiff prior to the shooting—are within *Terry's* strictures.  As discussed above, Defendant Officers' use of weapons was reasonable in light of the circumstances.  Moreover, the seizure was not unreasonably lengthy: the entire encounter—from the time Plaintiff exited the house to the time he was shot—lasted approximately two minutes.  *Doc. 57* ¶ 26; *Doc. 62* ¶ 26.

Because the seizure complied with *Terry's* requirements, the Court need not consider whether Defendant Officers had probable cause to seize Plaintiff.

## V.   CONCLUSION

Under the qualified immunity standard, Plaintiff has the burden to show that Defendant Officers violated his Fourth Amendment rights.  Plaintiff has failed to meet that burden:  the facts, even when viewed in the light most favorable to Plaintiff, do not support a finding that Plaintiff was seized by Defendant Officers.  Even if Plaintiff were seized, that seizure was reasonable.  Therefore, Defendants Hoisington, Kees, and Fox are entitled to qualified immunity on Count I of Plaintiff's complaint.

Wherefore, City Defendants' Motion for Partial Summary Judgment No. I on the Unlawful Seizure Claim in Count I of the Complaint and the Corresponding Municipal Liability Claim in Count VII, *doc. 57*, is GRANTED.  Count I of Plaintiff's complaint is DISMISSED with prejudice.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**