IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEPHAN CORDOVA,

    Plaintiff,

v.                                                             Civ. No. 11-806 GBW/ACT

CITY OF ALBUQUERQUE,
RAY SCHULTZ, CARLOS ARGUETA,
AARON HEYMAN, MATTHEW
HOISINGTON, KEVIN KEES,
JAMES FOX, and KENNETH NEIBERGER,

    Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT III

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment No. III on Count V of Plaintiff's Complaint Due to Restriction of Visitation, *doc. 76*.[1] Having reviewed the briefing, *docs. 83 & 93*, the Court denies the motion.

**I.**     **BACKGROUND**

This case concerns the shooting of Plaintiff on Mesa Arriba Avenue, NE in Albuquerque, New Mexico on July 30, 2008, by officers of the Albuquerque Police Department (APD). The events leading up to the shooting are discussed in the Court's

---

[1] Although Plaintiff has titled his motion as a motion for summary judgment on Count V, the motion concerns Plaintiff's associational rights, which are discussed in Count III. The Court therefore treats the motion as a motion for summary judgment on Count III of the Complaint.

1

February 22, 2008, order on Defendants' Motion for Partial Summary Judgment on Count I of the Complaint and the Court will not repeat them here. *See doc. 107*.

The instant motion concerns the events that occurred between July 30, 2008, and August 4, 2008, while Plaintiff was hospitalized. After the shooting, Plaintiff was transported to the University of New Mexico Hospital (UNMH), where he underwent emergency surgery. *Doc. 1* ¶ 22; *Doc. 83* at 4. He was then moved to UNMH's intensive care unit. *Doc. 1* ¶ 22; *Doc. 83* at 4. Police guards were posted outside of Plaintiff's hospital room. *Doc. 1* ¶ 27; *Doc. 81*, Ex. A ¶ 18.

Defendant Aaron Heyman, an APD detective, and Defendant Carlos Argueta, a sergeant in the Violent Crimes Unit of APD, were both involved in the investigation of the shooting. *Doc. 81*, Ex. A; *Doc. 83*, Ex. A. On July 31, 2008, both Defendants Heyman and Argueta issued orders stating that no one, including Plaintiff's family, should be permitted to visit him in the hospital. *Doc. 81*, Ex. A ¶ 11; *Doc. 83*, Ex. A ¶ 9. On the same day, Defendant Heyman secured an arrest warrant for Plaintiff, charging him with Aggravated Assault on a Police Officer. *Doc. 75*, Ex. B; *Doc. 81*, Ex. A ¶¶ 14-18.

On August 4, 2008, after Plaintiff's condition had stabilized and he was able to speak, Defendant Heyman attempted to interview him. *Doc. 1* ¶ 25; *Doc. 81*, Ex. A ¶¶ 25-26. Defendant Heyman advised Plaintiff of his *Miranda* rights and Plaintiff invoked his right to counsel. *Doc. 81*, Ex. A ¶¶ 30-31. Defendant Heyman then concluded the

interview and notified APD and Lynda Cordova, Plaintiff's wife, that he could now receive visitors. *Doc. 1* ¶ 27; *Doc. 81*, Ex. A ¶¶ 32-34.

Plaintiff remained hospitalized until August 20, 2008 when he was transported to the Metropolitan Detention Center (MDC), allegedly in violation of a court order. *Doc. 1* ¶ 39. Plaintiff's family bonded Plaintiff out of MDC on August 22, 2008. *Id*. ¶ 41. During his time at MDC, Plaintiff allegedly did not receive adequate medical care and had to return to the hospital immediately upon release.[2] *Id*. ¶¶ 42-43.

Plaintiff initially filed suit against Defendants in state court. *See doc. 1*. Defendants removed the case to this Court on September 8, 2011. *Id*. Plaintiff brought seven counts under 42 U.S.C. § 1983, of which two have since been dismissed. *See docs. 66 & 107*. Of the remaining five counts, only Count III, alleging the violation of Plaintiff's right of association under the First Amendment is at issue in the instant motion. *Doc. 57*.

## II. STANDARD OF REVIEW

### A. Summary judgment

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[2] As the instant motion concerns only the events that occurred while Plaintiff was hospitalized and his family was unable to visit him, the Court provides an abbreviated description of the events thereafter. These events will be discussed in greater depth in this Court's rulings on Defendants' and Plaintiff's pending motions for summary judgment on Counts V and VI of Plaintiff's complaint. *See docs. 75, 77, 78, 79*.

3

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). All material facts set forth in the motion and response which are not specifically controverted are deemed undisputed. D.N.M.LR-Civ. 56.1(b).

When reviewing a motion for summary judgment, the court should keep in mind three principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249. Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light

4

most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999). Third, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255. "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id.* at 257.

### B. Qualified Immunity

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Although Plaintiff, rather than Defendants, filed this motion, Defendants have asserted qualified immunity in their response. *Doc. 83* at 7. "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff who must clear two hurdles to defeat the [defense]. The plaintiff must demonstrate, on the facts alleged, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity." *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (citations omitted).

### C. Instant Case

The briefing posture of the instant case is unusual given that Plaintiff has moved for summary judgment and Defendants have responded by arguing that Plaintiff has not established that he can prevail over the defense of qualified immunity. *See doc. 83*.

5

So, while Defendants invoke the qualified immunity defense, they have not moved for dismissal on that basis. *Id*. Instead, they simply ask the Court to deny Plaintiff's motion. *Id*. at 2, 14. At the hearing on this matter, the Court discussed this wrinkle with the parties. *Doc. 110*. Based on those discussions, the Court will herein consider only whether, as a matter of law, Plaintiff prevails on Count III given the putative qualified immunity defense, but will not grant dismissal on that basis until the parties have the opportunity to fully articulate their arguments on the defense presumably initiated via a defense motion for summary judgment on that basis.

### III.   UNDISPUTED FACTS[3]

1. The undisputed facts listed in the Court's February 22, 2008, order on Defendants' Motion for Partial Summary Judgment on Count I of the Complaint are hereby incorporated. *See doc. 107*.

2. On the evening of July 30, 2008, Plaintiff was transported to UNMH for emergency surgery. *Doc. 1* ¶ 22; *Doc. 83* at 4 & Ex. A ¶ 5.

3. Plaintiff was in police custody from the time that he was transported to the hospital. *Doc. 76* at 3 & Ex. 1 at 35:8-25; *Doc. 83* at 4.

4. Following the surgery, Plaintiff was transferred to UNMH's intensive care unit. *Doc. 1* ¶ 22; *Doc. 83* at 4 & Ex. A ¶ 6. Plaintiff was heavily sedated and unable to

---

[3] All material facts not specifically controverted by the opposing party are deemed undisputed. *See* D.N.M.L.R.-Civ. 56.1(b); Fed. R. Civ. P. 56(e)(2).

6

speak because he was breathing through mechanical ventilation. *Doc. 83* at 4 & Ex. A ¶ 7.

5. Defendants Argueta and Heyman both investigated Plaintiff's shooting. *Doc. 81*, Ex. A ¶ 6; *Doc. 83* at 4 & Ex. A ¶ 4.

6. On July 31, 2008, Defendant Argueta ordered that "no one is allowed to speak with 16 [Plaintiff] unless authorized by Sgt. Argueta. No family. No attorneys. Nobody." *Doc. 76* at 2 & Ex. 1 at 21:10-22:7, ex. 1; *Doc. 83* at 3 & Ex. A ¶ 9. He testified that he did so to "[e]nsure the integrity of the investigation" and "maintain control of the situation and for officer safety." *Doc. 83*, Ex. A ¶ 10.

7. On the morning of July 31, 2008, Defendant Heyman gave orders that Plaintiff was to have no visitors. *Doc. 76* at 2 & Ex. 2 at 10:21-11:8; *Doc. 83* at 3. He testified that he did so "[t]o ensure the integrity of the investigation by giving Mr. Cordova the opportunity to speak candidly to police investigators without feeling that his candor was restrained" and "to avoid the potential volatile situation with family members given Mr. Cordova's injuries." *Doc. 76* at 2 & Ex. 2 at 11:2-15; *Doc. 81*, Ex. A ¶¶ 11-12; *Doc. 83* at 3-4.

8. Defendant Argueta testified that it is the APD's practice to restrict visitors to victims of officer-involved shootings until the APD has had the opportunity to ask the person for a statement. *Doc. 76* at 2, Ex. 1 at 27:3-17, Ex. 2 at 13:3-24; *Doc. 83* at 3.

7

9. Custodial interviews of suspects are routinely conducted outside of the presence of family and friends. *Doc. 81*, Ex. A ¶ 12(B); *Doc. 83* at 5 & Ex. A ¶ 10(A).

10. On August 4, 2008, Plaintiff was awake and able to communicate. *Doc. 81*, Ex. A ¶ 24; *Doc. 83* at 5 & Ex. A ¶ 15.

11. Defendant Heyman interviewed Plaintiff in his hospital room. *Doc. 81*, Ex. A ¶ 26; *Doc. 83* at 5 & Ex. A ¶ 15. Defendant Heyman read Plaintiff his *Miranda* rights and was informed by Plaintiff that Plaintiff would like to speak to an attorney. *Doc. 81*, Ex. A ¶¶ 30-31; *Doc. 83* at 5 & Ex. A ¶¶ 16-17. At that point, Defendant Heyman concluded the interview. *Doc. 81*, Ex. A ¶ 32; *Doc. 83* at 5 & Ex. A ¶ 17.

12. After the interview, Defendant Argueta's order restricting visitation expired. *Doc. 83* at 6 & Ex. A ¶¶ 18-19. Upon leaving the hospital, Defendant Heyman called APD dispatch and Lynda Cordova to let them know that he could now receive visitors. *Doc. 81*, Ex. A ¶ 34; *Doc. 83* at 6.

## IV. ANALYSIS

Plaintiff alleges that Defendants City of Albuquerque, Heyman, Argueta, and Schultz[4] violated his constitutional right to familial association when they prevented his family from visiting him from July 31, 2008, to August 4, 2008.[5] Defendants contend that they have qualified immunity because (1) their visitation restriction was rationally

---

[4] Defendant Schultz is not listed in Count III. However, in Count VII, Plaintiff claims he has supervisory liability for the conduct alleged in Count III. *Doc. 1*, ¶¶ 69-73.
[5] Count III also includes allegations against Defendant Fox on a related but different basis. Plaintiff does not seek summary judgment against Defendant Fox in the instant motion. *See doc. 76* at 1.

8

related to a legitimate government interest and therefore did not violate Plaintiff's associational rights, and (2) even if they did violate Plaintiff's rights, the right to familial association in this context is not clearly established. The Court concludes that Plaintiff has not established as a matter of law that he can prevail over Defendants' defense of qualified immunity.[6]

**A. Framework for review**

Plaintiff was charged with the crime of aggravated assault on a peace officer on the evening of July 31, 2008, when Defendant Heyman sought and the judge issued a warrant for Plaintiff's arrest. *Doc. 75*, Ex. B. At this time, Plaintiff was in the custody of the police at the hospital and was under arrest. *Doc. 77*, ¶ 10;[7] *Doc. 81* at 2-3.[8] A pretrial detainee is a "person[] who ha[s] been charged with a crime but who ha[s] not yet been tried on the charge." *Bell v. Wolfish*, 441 U.S. 520, 523 (1979). Consequently, during the dates at issue in this motion—July 31, 2008, to August 4, 2008, the dates during which Defendants prevented Plaintiff's family from visiting him—Plaintiff was a pretrial

---

[6] Of course, Defendant City of Albuquerque is not shielded by qualified immunity. Nonetheless, if a court decides in favor of qualified immunity for an individual officer on the basis of the plaintiff's failure to show a constitutional violation, the municipality prevails as well. *See Hinton v. City of Elwood*, 997 F.2d 774, 782-83 (10th Cir. 1993). Because the Court concludes that Plaintiff has failed to establish, as a matter of law, a constitutional violation by the individual officers, Plaintiff cannot be granted summary judgment against Defendant City either. The same is true for the claim against Defendant Schultz which is based on supervisory liability.
[7] Plaintiff incorporates his factual allegations from *doc. 77* into the instant motion. *Doc. 76* at 2.
[8] Apparently there is a dispute about whether Plaintiff was under arrest when he was first brought to the hospital. Plaintiff contends that he was. *Doc. 77*, ¶ 10. Defendant argues that he was only "in custody" at that time. *Doc. 81* at 2-3. Nonetheless, there appears no dispute that, once the arrest warrant was signed and brought to the hospital on the evening of July 31st, Plaintiff was under arrest.

9

detainee. As a pretrial detainee, Plaintiff "d[id] not possess the full range of freedoms of an unincarcerated individual." *Bell*, 441 U.S. at 546.

The standard under which the Court should review the pre-trial visitation restriction which was implemented by Defendants is unclear. Most cases involving pre-trial restrictions look simply at whether a given pre-trial restriction amounts to the punishment of the detainee. *See, e.g., Bell*, 441 U.S. at 534-37. Under this analysis, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. at 538. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment . . . ." *Block v. Rutherford*, 468 U.S. 576, 584 (1984) (quoting *Bell*, 441 U.S. at 539). "[I]n the absence of substantial evidence in the record to indicate that [prison or law enforcement] officials have exaggerated their response to these [legitimate interests] courts should ordinarily defer to their expert judgment" regarding restrictions during pretrial detention. *Id*.; *see also Salazar v. Seagrave*, No. 00-841 (D.N.M. Mar. 8, 2002) (doc. 72) (deferring to doctor's decision to deny visitation privileges to hospitalized pretrial detainee in absence of evidence that his safety concerns were exaggerated). This analytical framework arises out of an

individual's right under the Due Process Clause "not to be punished prior to an adjudication of guilt in accordance with due process of law." *Block*, 468 U.S. at 583.

However, Plaintiff has asserted that Defendants' visitation restriction also violates an independent right—his right of intimate association.[9] This right protects the "choice[] to enter into and maintain certain intimate human relationships." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). This type of association is a substantive due process right, "properly based on the 'concept of liberty in the Fourteenth Amendment.'" *See Griffin v. Strong*, 983 F.2d 1544, 1546-47 (10th Cir. 1993) (quoting *Mayo v. Lane*, 867 F.2d 374, 375 (7th Cir. 1989)). The Supreme Court has held that there are four relevant factors "in deciding whether a prison regulation affecting a constitutional right **that survives incarceration** withstands constitutional challenge: whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right;

---

[9] Plaintiff claims that Defendants violated his right to associate, but refers alternately to the First Amendment and the Fourteenth Amendment as the source of that right. *See doc. 1* at 7; *doc. 76* at 1-2, 5. In *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), the Supreme Court distinguished between two types of constitutionally protected freedoms of association. The first is protected by the First Amendment and provides "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." 468 U.S. at 618. This right is often referred to as the "freedom of expressive association." *See Griffin v. Strong*, 983 F.2d 1544, 1546 (10th Cir. 1993). The second type of freedom of association—sometimes referred to as the freedom of "intimate association" or "familial association"—protects the "choice[] to enter into and maintain certain intimate human relationships." *Roberts*, 468 U.S. at 617-18. This type of association is a substantive due process right, "properly based on the 'concept of liberty in the Fourteenth Amendment.'" *Griffin*, 983 F.2d at 1546-47 (quoting *Mayo v. Lane*, 867 F.2d 374, 375 (7th Cir. 1989)). Plaintiff does not claim that Defendants prevented him from expressing himself in any way. He asserts only that he was deprived of his right to associate with his family. Therefore, despite Plaintiff's references to the First Amendment, *doc. 1* at 7; *doc. 76* at 2, it is the Fourteenth Amendment freedom of familial association that is at issue in this case.

what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Overton v. Bazzetta*, 539 U.S. 126, 131-36 (2003) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)) (emphasis added).

Consequently, to prevail on his motion, Plaintiff must, as a matter of law, overcome the qualified immunity defense under either the theory that the visitation restriction "amounted to punishment," or the theory that the *Turner* factors apply and were violated. As noted above, to overcome the qualified immunity defense for the purposes of his summary judgment motion, Plaintiff must prove both the existence of a constitutional right violation and that the right was clearly established. With respect to the "amounted to punishment" theory, the Court finds that he has failed to establish the existence of the violation as a matter of law.[10] With respect to the "*Turner* factor" theory, the Court finds that he has failed to establish the existence of the violation as a matter of law and that he has failed to establish the right was clearly established.

**B. Plaintiff has not established that, as a matter of law, the visitation restriction amounted to punishment**

As described above, the key question is whether the restriction was imposed for the purpose of punishment. Plaintiff has not pointed to any direct evidence in the record that Defendants restricted Plaintiff's family visits in order to punish him.

---

[10] The Court expresses no opinion about whether, if the constitutional violation were demonstrated, the right was clearly established.

Nonetheless, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment . . . ." *Block*, 468 U.S. at 584. Defendants assert two justifications for their visitation restrictions. First, they wanted to ensure that Plaintiff's initial statement to the police was not influenced or "contaminated" by his family. *Doc. 81*, Ex. A ¶ 12(B)-(C); *Doc. 83* at 8 & Ex. A ¶ 10(A). Second, they feared that visitation by Plaintiff's family could lead to "a potentially volatile situation" that could threaten the safety of the officers guarding Plaintiff, hospital personnel, and Plaintiff himself. *Doc. 81*, Ex. A ¶ 12(D); *Doc. 83* at 8 & & Ex. A ¶ 10(B).

Plaintiff contends that Defendants' purported interest in an uncontaminated interview is illegitimate because "[t]he concept . . . [of] a contamination free interview[] finds no support in law or law enforcement practice." *Doc. 93* at 1. Over the years courts have identified a variety of legitimate interests that justify imposing visitation restrictions on pretrial detainees. These have included ensuring the safety and security of officers, visitors, and detainees; preventing the introduction of contraband; preventing escape and unauthorized entry; preventing communication with conspirators; and protecting child visitors. *See, e.g., Overton v. Bazzetta*, 539 U.S. 126, 133-34 (2003); *Ramos v. Lamm*, 639 F.2d 559, 587 (10th Cir. 1980); *Chappell v. McKune*, 132 F.3d 42 (10th Cir. 1997). While Defendants have not provided—nor has the Court found—case law holding that obtaining an uncontaminated statement from a pretrial

13

detainee is a legitimate government interest, Plaintiff has identified no case law finding that it is *not* a legitimate interest. Nor has Plaintiff offered any evidence that the asserted interest is a pretense. In fact, Plaintiff argues the opposite: "the restriction on visitation was solely the result of Heyman and Argueta's desire to get a statement from Cordova." *Doc. 93* at 2-3. Moreover, Plaintiff's unsupported statement that concern for a contamination-free interview "finds no support in . . . law enforcement practice" is directly contradicted by Defendants' evidence, which indicates that APD routinely attempts to obtain uncontaminated statements from arrestees. *See doc. 76*, Ex. 1 at 22:12-23:2, Ex. 2 at 13:7-24.

In the absence of any evidence undermining the legitimacy of the justification, the Court must make all reasonable inferences and resolve all doubts in favor of the nonmoving party—Defendants. There are many legitimate reasons that the police would want to attempt to guarantee that the victim of an officer-involved shooting provided a statement uncontaminated by the thoughts and views of others. As investigators, Defendants want to hear Plaintiff's side of the story—why he behaved the way he did and what his intentions were during the confrontation between himself and the police. If Plaintiff had received visitors prior to providing a statement, his memories might well be affected by their descriptions and experiences. This is especially true in this case where members of Plaintiff's family witnessed the shooting and the aftermath and interacted directly with the police. *See doc. 107* at 6.

Plaintiff argues that Defendants' interest in an uncontaminated statement cannot be legitimate because the APD does not attempt to obtain uncontaminated statements from officers involved in shootings. While Plaintiff is correct that officers are treated differently from pre-trial detainees, this unequal treatment is arguably justifiable. Simply put, the pre-trial detainee has been charged with a crime. The officer, while his conduct may be under investigation, has not been charged with a crime. This difference alone may justify the disparity. Moreover, the disparate treatment by itself does not conclusively undermine the legitimacy of Defendants' stated interest in an uncontaminated statement. The interest can still be legitimate, even if it is not applied equally.

On the current record, the Court does not find that the visitation restriction was arbitrary or purposeless such that one should infer that its purpose was punitive. In fact, the record supports the contrary finding. The restriction was short and dictated by Plaintiff's medical condition: it lasted only for the five days during which Plaintiff was unconscious and unable to speak.[11] *See Bell*, 441 U.S. at 543 (finding length of restriction relevant to its constitutionality). Plaintiff was interviewed as soon as he was able to speak, and the restriction was terminated immediately after the interview. This prompt

---

[11] Plaintiff's condition from July 31, 2008, to August 4, 2008, is not entirely clear from the record. Defendant Heyman's affidavit suggests that during that period Plaintiff was unconscious or otherwise so sedated and/or intubated as to be unable to communicate. *See* Undisputed Fact 10, *supra*; doc. 81, Ex. A ¶¶ 22-24. Because the Court must resolve all doubts in favor of Defendants and because Plaintiff has offered no evidence indicating otherwise, the Court will assume Defendant Heyman's account is accurate.

15

cessation of the restriction occurred despite the fact that, upon being advised of his *Miranda* rights, Plaintiff instantly invoked those rights and refused to speak to the officers. *Doc. 81*, Ex. A ¶ 32. If the officers intended the visitation restriction to be punishment, one would expect that Plaintiff's refusal to cooperate would lengthen, not immediately end, the punishment.

For all of these reasons, Plaintiff has not established that the visitation restriction amounted to punishment.

### C. Plaintiff has not established, as a matter of law, that the visitation restriction was unconstitutional under the *Turner* factors

Assuming the applicability of the *Turner* factors to the instant case, the Court is required to consider: "whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Overton*, 539 U.S. at 131-36 (2003) (quoting *Turner*, 482 U.S. at 89). Plaintiff, as the moving party, bears the burden of showing that there is an absence of evidence to support the nonmoving party's case. While Plaintiff has presented some facts and argument relevant to the first factor, he has presented no evidence or argument on the remaining three factors. As such, he falls far short of establishing a constitutional violation under *Turner* as a matter of law.

16

**D. Plaintiff has not established that, as a matter of law, it was clearly established that the *Turner* factors were applicable to and violated by the visitation restriction**

"Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson*, 483 U.S. at 640 and citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The first problem for Plaintiff is that it is not clearly established that the right to intimate association survives incarceration. The Supreme Court last addressed the issue in response to a challenge to a state's new regulations limiting prison visitations. *Overton*, 539 U.S. at 129-31. While the new regulations also limited certain "contact" visitations, the restrictions before the Court dealt with the restrictions on non-contact visitations.[12] In *Overton*, the Court explained:

---

[12] In "non-contact" visitations, the visitor and detainee are separated by a physical barrier. In "contact" visitations, the visitor and detainee are permitted some, if highly regulated, contact. *See, e.g., Bazzetta v. McGinnis*, 124 F.3d 774, 775-76 (6th Cir. 1997); *Bazzetta v. McGinnis*, 148 F. Supp. 2d 813, 831 (E.D. Mich. 2001), *rev'd by Overton v. Bazzetta*, 539 U.S. 126 (2003). This distinction is important in the instant case because any hospital visit would have been a "contact" visit. This Court has found no court which has found any limitation on contact visitation to be unconstitutional. *See, e.g., Ky. Dep't of Corr. v. Thomson*,

> We have said that the Constitution protects "certain kinds of highly personal relationships," *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 619-620 (1984). And outside the prison context, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents. *See Moore v. East Cleveland*, 431 U.S. 494 (1977) (plurality opinion); *Meyer v. Nebraska*, 262 U.S. 390 (1923).
>
> This is not an appropriate case for further elaboration of those matters. The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration. *See Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977); *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). And, as our cases have established, freedom of association is among the rights least compatible with incarceration. *See Jones, supra*, at 125-126; *Hewitt v. Helms*, 459 U.S. 460 (1983). Some curtailment of that freedom must be expected in the prison context.
>
> We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners. We need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests. This suffices to sustain the regulation in question. *See Turner v. Safley*, 482 U.S. 78, 89 (1987).

539 U.S. at 131-32 (duplicate citations omitted). Given that the Court expressly stopped short of determining the extent that the right of association survives incarceration, it is difficult to conclude that the right asserted by Plaintiff is clearly established.

---

490 U.S. 454, 460-61 (1989); *Bazzetta v. McGinnis*, 124 F.3d 774, 779-80 (6th Cir. 1997). Admittedly, most such cases involve inmates rather than detainees in the context of a prison and not a hospital. Still, it reinforces the lack of clearly established law that would establish that the visitation restriction imposed in this case was unconstitutional.

Notwithstanding the Supreme Court's careful words on this point, the Tenth Circuit has assumed that the right to intimate association does survive incarceration. *See Wirsching v. Colorado*, 360 F.3d 1191, 1198-1201 (10th Cir. 2004). So, perhaps in the Tenth Circuit, it is clearly established that the right survives. *But cf. Bazzetta v. McGinnis*, 430 F.3d 795, 804 (6th Cir. 2005) ("We know of no circuit court that has found an implicit due process right to prison visitation."). Assuming so, then, in the instant case, Plaintiff must also show that it is clearly established that the visitation restriction would be unconstitutional under the *Turner* factors.

As described above, *Turner* requires a consideration of four factors, but does not further describe how the balancing should be conducted. Of note, the Supreme Court has described *Turner* as a "high standard" for plaintiffs to satisfy. *See Overton*, 539 U.S. at 136. Moreover, the Court has recognized that the more general a legal rule, the more specific prior precedence must be to be "clearly established." *See Anderson*, 483 U.S. at 639-40. At this time, Plaintiff has pointed to no case which is sufficiently similar to the instant facts that would enable this Court to conclude that a reasonable officer would have concluded that he was committing a constitutional violation by enforcing the visitation restriction.

## V. CONCLUSION

With respect to the "amounted to punishment" theory, the Court finds that Plaintiff has failed to establish the existence of the violation as a matter of law. With

19

respect to the "*Turner* factor" theory, the Court finds that he has failed to establish the existence of the violation as a matter of law and that he has failed to establish the right was clearly established.

Wherefore, Plaintiff's Motion for Partial Summary Judgment No. III, *doc. 76*, is DENIED.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**