IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEPHAN CORDOVA,

    Plaintiff,

v.                                                            No. 11-cv-806 GBW/ACT

CITY OF ALBUQUERQUE, CHIEF RAY SCHULTZ,
CARLOS ARGUETA, AARON HEYMAN,
MATTHEW HOISINGTON, KEVIN KEES, JAMES FOX,
AND KENNETH NEIBERGER,

    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT III

This matter is before the Court on Defendants' Motion for Partial Summary Judgment on Count III of Plaintiff's Complaint on the basis of qualified immunity. *Doc. 123*. Count III of Plaintiff's Complaint alleges constitutional violations of Plaintiff's right to associate with his family. *Doc. 1*, Ex. A at 7. The Court, having reviewed the motion and accompanying briefing (*docs. 128, 138*), and being fully advised, will GRANT Defendants' Motion.

I.    **BACKGROUND**

This case concerns the shooting of Plaintiff by officers of the Albuquerque Police Department on July 30, 2008, on Mesa Arriba Avenue, NE, in Albuquerque, New Mexico. The facts underlying this matter have been set forth in detail in the Court's

1

prior orders (*see, e.g.*, docs. 107 & 112). The Court will therefore only briefly summarize the events relevant to this motion here.

Officers from the Albuquerque Police Department ("APD") arrived at Plaintiff's mother's house on July 30, 2008, pursuant to a 911 call. *Doc. 1*, Ex. A at 2 ¶¶ 4-5, 8. When they arrived at the scene, the officers were informed that Plaintiff had been refusing medical treatment, was in possession of a weapon, and was threatening anyone who approached the home. *Doc. 57*, Ex. A at 78:20-25. Based on this information, Plaintiff's family members were asked to leave the house so that the officers could interview them and ascertain the situation. *Doc. 57*, Ex. B at 91:13-92:11.

Shortly thereafter, Plaintiff exited the house with a gun in his right front pocket. *Doc. 57*, Ex. C at 63:9-11. The situation escalated and, ultimately, Plaintiff was shot and wounded by the APD officers. *Doc. 1*, Ex. A at 3 ¶ 18. Plaintiff was immediately taken to the University of New Mexico Hospital ("UNMH") for emergency surgery. *Doc. 1*, Ex. A ¶ 22. He was in police custody at the time. *Doc. 121* at 2 ¶ 3; *Doc. 127* at 3.

Plaintiff remained hospitalized and was not able to speak until August 4, 2008. From June 30, 2008, until August 4, 2008, Plaintiff was not allowed any visitors. APD stated that they gave this order to further two interests—to maintain security and to obtain a statement from Plaintiff that was untainted by his conversations with others.

On August 4, 2008, upon being advised that Plaintiff was awake and able to speak, Detective Heyman entered his hospital room to obtain a statement. *Doc. 81*, Ex.

A at 4. Detective Heyman informed Plaintiff of his *Miranda* rights, at which point Plaintiff requested an attorney and the interview was terminated. *Id.* at 4-5. After the conclusion of the interview, Plaintiff was allowed to receive visitors. *Id.*

On October 26, 2012, Plaintiff filed a motion for partial summary judgment on Count III. *Doc. 76.* Plaintiffs argued for summary judgment only as to the claim that Defendants violated Plaintiff's constitutional rights when they refused to allow his family to visit him in the hospital between July 30, 2008, and August 4, 2008. *Id.* In response to Plaintiff's motion, Defendants raised the defense of qualified immunity. *Doc. 83*. The Court denied Plaintiff's motion on May 21, 2013, but declined to consider whether Defendants were entitled to summary judgment on the basis of qualified immunity because Defendants had not yet moved for dismissal on that basis. *Doc. 112.*

On August 9, 2013, Defendants filed the instant motion for summary judgment on Count III, seeking dismissal on the basis of qualified immunity. *Doc. 123.* In their motion, Defendants seek summary judgment both as to Plaintiff's claim that his rights were violated when his family was not permitted to visit him in the hospital, and as to Plaintiff's claim that his rights were violated when his family members were ordered to exit Plaintiff's mother's home after officers arrived at the scene prior to Plaintiff's shooting. Because Defendants' motion involves many of the same issues addressed in the Court's prior order (*doc. 112*), I will refer to that decision throughout this order.

## II. UNDISPUTED FACTS

1. On July 30, 2008, paramedics for the City of Albuquerque Fire Department responding to a 911 call arrived at Plaintiff's mother's residence on Mesa Arriba Avenue, NE, in Albuquerque, New Mexico. *Doc. 1*, Ex. A at 2 ¶¶ 4-5.
2. Plaintiff's sister-in-law, Kristin Cordova, had called 911. She stated that she believed Plaintiff was having a heart attack, and advised 911 that he was vomiting and complaining of a headache. *Doc. 57*, Ex. B at 88:14-89:10.
3. When the paramedics arrived, Ms. Cordova told them that Plaintiff was refusing treatment, had a weapon, and was threatening anyone who approached the house. *Id.* at 90:1-21; *Doc. 57*, Ex. A at 77:21-24
4. The paramedics notified their dispatcher that Plaintiff had a weapon and was making threats. They advised the dispatcher to contact the Albuquerque Police Department ("APD"). *Doc. 57*, Ex. A at 78:20-25.
5. When the APD officers arrived at the scene, they asked Plaintiff's family members to exit the house and interviewed them to ascertain the situation. *Doc. 57*, Ex. B at 91:13-92:11.
6. Sergeant Fox spoke with Kristin Cordova, who confirmed that Plaintiff had not yet threatened anyone. Ms. Cordova also informed Sergeant Fox that Plaintiff was on pain medication and was going through a difficult divorce. *Doc. 57*, Ex. C at 61:1-18.
7. Based on this information, Sergeant Fox believed Plaintiff might be suicidal and could pose a danger to himself or to others on site. *Id.*
8. At some point, Plaintiff exited the house with his gun in the front right pocket of his pants. *Id.* at 63:9-11.
9. Plaintiff was ultimately shot and wounded by the APD officers. *Doc. 1*, Ex. A at 3 ¶ 18.
10. Directly following the shooting, Plaintiff was admitted for emergency surgery at the University of New Mexico Hospital ("UNMH"). *Doc. 1*, Ex. A ¶ 22.
11. Plaintiff was in police custody from the time he was transported to the hospital. *Doc. 121* at 2 ¶ 3; *Doc. 127* at 3.
12. Detective Heyman and Carlos Argueta began to conduct an investigation into the incident surrounding Plaintiff's shooting. APD ordered that no one was allowed to speak with Plaintiff unless so authorized. *Doc. 76*, Ex. 1 at 21:10-22:6.

13. APD provided several reasons for restricting access to Plaintiff, including to ensure the integrity of the investigation into the criminal charges against Plaintiff, to avoid a potentially volatile situation, and to maintain security.[1] *Doc. 81*, Ex. A at 2-3.
14. On July 31, 2008, Judge Butkus at the Metropolitan Court for Bernalillo County approved and signed an arrest warrant charging Plaintiff with aggravated assault on a peace officer. *Doc. 81*, Ex. A at 3.
15. Plaintiff was recovering in the hospital and unable to speak until August 4, 2008. *Doc. 121* at 3 ¶ 9; *Doc. 127* at 3.[2]
16. On the morning of August 4, 2008, upon being advised that Plaintiff was stable and able to communicate, Detective Heyman entered Plaintiff's hospital room to ask him for a statement. *Doc. 81*, Ex. A at 4.
17. Detective Heyman advised Plaintiff of his *Miranda* rights, and Plaintiff stated he wished to speak to an attorney. At that point, Detective Heyman terminated the interview. *Doc. 81*, Ex. A at 4-5.
18. Once Detective Heyman ended the interview, he advised APD that Plaintiff was no longer prevented from receiving visitors. *Id.*

### III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate

---

[1] While Plaintiff does not contest that the officers provided these reasons for restricting Plaintiff's visitation, Plaintiff does dispute the validity of their reasons.

[2] It is undisputed that Plaintiff was not able to speak until August 4, 2008. However, it is not entirely clear from the record whether Plaintiff was conscious and alert at any point prior to that date.

5

specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). All material facts set forth in the motion and response which are not specifically controverted are deemed undisputed. D.N.M.LR-Civ. 56.1(b).

When reviewing a motion for summary judgment, the court should keep in mind three principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249. Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999). Third, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255. "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id.* at 257.

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff who must clear two hurdles to defeat the defendant's motion. The plaintiff must demonstrate, on the facts alleged, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity." *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (internal citations omitted).

While the defense of qualified immunity is only available to individual municipal officers, granting summary judgment on the basis of qualified immunity may also have an effect on municipal liability. *See Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993). "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Id. a*t 782 (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). As set forth above, "[an] individual municipal officer may be entitled to qualified immunity either because the law is not clearly established, or because the officer's conduct did not violate the law . . . . When a finding of qualified immunity is predicated on this latter basis, such a finding is equivalent to a decision on the merits of the plaintiff's claim . . . and a finding of qualified immunity may preclude the imposition of any municipal liability." *Id.* at 782-83.

## IV. ANALYSIS

### A. Defendants did not violate Plaintiff's right to familial association when they gave the order that Plaintiff was not permitted visitors in the hospital between July 30, 2008, and August 4, 2008.

Plaintiff alleges that Defendants City of Albuquerque, Heyman, Argueta, and Schultz[3] violated his constitutional rights when they prevented his family from visiting him in the hospital from July 30, 2008, to August 4, 2008. As the Court explained in its prior order, Plaintiff's claim may be reviewed under either of two standards. *Doc. 112* at 10-11. In the first instance, Plaintiff may argue that the restrictions on visitation amounted to "punishment" of a pretrial detainee. In the alternative, Plaintiff may assert that his right to intimate association was violated under the factors laid out in *Turner v. Safley*, 482 U.S. 78 (1987). The Court will address each argument in turn.

#### 1. *Plaintiff has not established that the restrictions on visitation were intended to punish Plaintiff.*

Plaintiff was in custody and under arrest at the time the restrictions on visitation were imposed. As the Court previously explained, Plaintiff was therefore a pretrial detainee and not entitled "to the full range of freedoms of an unincarcerated individual." *Bell v. Wolfish*, 441 U.S. 520, 523, 546 (1979) (defining "pretrial detainees" as

---

[3] As explained in the Court's prior order, Defendant Schultz is not listed in Count III. However, in Count VII, Plaintiff claims he has supervisory liability for the conduct alleged in Count III. *Doc. 1*, ¶¶ 69-73.

8

"those persons who have been charged with a crime but who have not yet been tried on the charge").

Cases assessing the constitutionality of restrictions on pretrial detainees center around whether the restriction amounts to "punishment . . . prior to an adjudication of guilt in accordance with due process of law." *Id.* at 535.

To meet his burden in the face of a qualified immunity defense, *Bell* requires that Plaintiff must show either an "expressed intent to punish" on the part of the detaining officers, or "that the restriction in question bears no reasonable relationship to any legitimate governmental objective." *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013). As Plaintiff presents no evidence of the former, he must rely on the second approach.

Defendants claim two legitimate governmental objectives: (1) they wanted to ensure that Plaintiff's initial statement to the police was not influenced or contaminated by his speaking with others; and (2) they feared that visitation by Plaintiff's family could lead to a potentially volatile situation that could threaten the safety of the officers guarding Plaintiff, hospital personnel, and Plaintiff himself. *Doc. 123* at 6-7. Plaintiff argues that these objectives are pretext and that the real motive was punitive.

It is unclear under what standard the Court should review this dispute. Of course, under a standard summary judgment motion, the non-moving plaintiff is entitled to have the Court view the facts and draw reasonable inferences in the light

9

most favorable to him. But, in the face of a qualified immunity defense, a plaintiff has the burden of establishing that a clearly established right was violated. Here, there are no material disputes regarding what happened or what the officers did. The only debate is whether, from those actions and the explanations for them, the intent to punish could be inferred. So, is this a purely legal question for the Court as most qualified immunity issues are? Or does the Court, even if it would conclude differently, ask if a reasonable jury could make such an inference? In this case, the Court concludes that this distinction does not make a difference in the end.

In reviewing the proffered governmental objectives, the fact finder is directed to avoid second guessing stated government interests. *See, e.g., id.* at 531; *Block v. Rutherford*, 468 U.S. 576, 593 (1984). "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these [legitimate interests,] courts should ordinarily defer to their expert judgment" regarding restrictions during pretrial detention. *Block*, 468 U.S. at 584-85 (internal quotations and citations omitted).

Plaintiff points to the following facts to show that the proffered objectives were a pretext and that punitive intent should be inferred: (1) the officers involved in the shooting were allowed access to their families prior to giving statements, which undermines the claimed "integrity of investigation" objective; and (2) Defendants allowed Plaintiff's family access to him immediately after Plaintiff gave his initial

10

interview, which undermines the claimed "threat to safety" objective. No reasonable juror could infer from these facts a punitive intent.

With respect to the "integrity of investigation" objective, the mere difference in treatment between Plaintiff and the officers would not justify the leap to punitive intent. As the Court earlier noted, the pretrial detainee has been charged with a crime. The officer, while his conduct may be under investigation, has not been charged with a crime. This difference alone may justify the disparity. More significantly, the familial access restriction was removed immediately after Plaintiff was able to be interviewed. In fact, the restriction was removed despite Plaintiff's complete refusal to speak to the officers when he was finally able to speak. It would seem an odd thing that a restriction intended only to punish would be lifted at that time. Indeed, the facts strongly support the proffered "integrity of investigation" objective.[4]

With respect to the "threat to safety" objective, the fact that the officers later terminated the access restriction after the passage of time in no way undermines the claim that tensions were high in the immediate aftermath of the shooting. Perhaps if this were the sole legitimate objective, it could have only justified the restriction for a much shorter time. However, as discussed above, the "integrity of investigation" objective was still in effect until the officers were able to speak to Plaintiff. In short, Plaintiff presents no facts to undermine this proffered objective.

---

[4] The subtext of Plaintiff's argument is that the "integrity of investigation" objective is not a "legitimate" governmental interest. However, Plaintiff does not expressly make this argument and certainly cites to no law in support of this position.

11

Even viewing every fact in the light most favorable to Plaintiff on the evidence presented, no reasonable inference can be made that the access restrictions were intended to punish. Therefore, he cannot defeat the qualified immunity defense for this claim on this theory.

## 2. *Plaintiff fails to establish a constitutional violation under the* **Turner/Overton** *factors.*

The Court has reviewed the restriction on Plaintiff's visitation as a consequence of pretrial detention, which is reviewed to determine if it was intended as punishment. Perhaps, as Defendants first argue, such should be the only question on this claim. In its earlier order, the Court suggested that the restriction might also be reviewed under the factors set forth in *Turner v. Safley*, 482 U.S. 78, 87 (1987) and *Overton v. Bazzetta*, 539 U.S. 126, 131-36 (2003). *See doc. 112* at 11-12, 16-19. Neither party agrees that these factors apply and the Court concedes they are an ill fit for the circumstances in this case.[5] Nonetheless, they are a framework which can guide an analysis of restrictions placed on individuals in the custody of the government. Assuming their application, Plaintiff has failed to establish a constitutional violation.

Under *Turner*, a court must consider "whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the

---

[5] *Turner* and its progeny involve regulations affecting prison inmates who have been convicted, rather than pretrial detainees such as Plaintiff.

right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Overton v. Bazzetta*, 539 U.S. 126, 131-36 (2003) (quoting *Turner*, 482 U.S. at 89).

With respect to the first factor, the Court has already determined that Defendants set forth legitimate concerns—including the interest in maintaining security and the interest in obtaining an uncontaminated statement from Plaintiff—which Plaintiff has not refuted with evidence on the record. As to the second factor, although Defendants concede that Plaintiff did not have alternative means of communicating with his family during the time period at issue, the Court notes that this period lasted for only five days, during which Plaintiff was unable to speak and would have been largely, if not entirely, incapable of communicating with his family. As to the two final factors, it is possible, and perhaps preferable, that lesser and alternative restrictions could have been utilized during those first five days. However, with each accommodation suggested by Plaintiff, the amount of necessary manpower to sufficiently supervise the interactions with visitors would have increased. Considering the four factors as a whole against the background principles that "freedom of association is among the rights least compatible with incarceration" and that *Turner* sets a "high standard" for establishing the unconstitutionality of prison regulations, the Court finds that Plaintiff has failed to establish a constitutional violation pursuant to the *Turner/Overton* factors. *Overton*, 539 U.S. at 131, 136.

### 3. *Plaintiff fails to establish a constitutional violation of his right to familial association.*

Plaintiff also contends that the visitation restriction should be reviewed under the broad test applied to familial association cases. *See Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993). Assuming that the restriction is subject to such review, Plaintiff has not established a constitutional violation under this test.

The right to familial association is grounded in the Fourteenth Amendment's Due Process Clause. *Lowery v. Cty. of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008). "To determine whether a substantive right protected by the Due Process clause has been violated, the Court balances 'the individual's interest in liberty against the State's asserted reasons for restraining individual liberty.'" *Id.* (quoting *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982)). In addition, the plaintiff must demonstrate that the defendant intended to interfere with that familial relationship. *Trujillo v. Bd. Of Cty. Comm'rs*, 768 F.2d 1186, 1190 (10th Cir. 1985). In fact, "not every statement or act that results in an interference with the rights of familial association is actionable. The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship." *Lowery*, 522 F.3d at 1092 (citations and quotations omitted).

Based upon the undisputed facts, Plaintiff cannot meet this test for two reasons. First, the conduct here—prohibition on all visitors—was not directed at the familial relationship. Although it would clearly impact family members more significantly than

friends or other potential visitors, the restriction was not directed at the relationship itself. Second, Plaintiff has not established that the restriction was done with knowledge that the restriction would adversely affect the familial relationship. As discussed above, the restriction was intended to ensure an accurate statement from Plaintiff if he wished to give one, and to ensure security in the hospital in the immediate aftermath of the shooting. Especially given that Plaintiff could not speak during the complete visitation prohibition, it is difficult to conclude that the officers knew the prohibition would adversely affect any particular familial relationship. Moreover, while many would agree that there is a value in having family members bedside during serious medical treatment, the hypothetical harm for preventing such visitation is not to the relationship itself.

In conclusion, under no theory (punitive pretrial restriction, *Turner/Overton*, or familial association) has Plaintiff established a constitutional violation based upon the visitation restrictions. Thus, Defendants are entitled to qualified immunity on this claim.

### B. Defendants did not violate Plaintiff's right to familial association when they asked Plaintiff's family members to leave Plaintiff's mother's house.

Plaintiff claims that Defendants violated his constitutional right to familial association when APD asked Plaintiff's family members to leave Plaintiff's mother's house prior to the shooting of Plaintiff. As Plaintiff was not under arrest or detained at the time of the alleged violation, this claim is reviewed only under the standard

governing the substantive due process right to intimate association. *See, e.g., Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993).

As with the hospital restrictions, this claim fails because Plaintiff has failed to set forth any evidence of intent to interfere with his relationship with his family. To the contrary, the record indicates that the officers ordered Plaintiff's family members out of the house with the objective of ascertaining the situation and maintaining the safety of all those in the area. Plaintiff has therefore not established a constitutional violation of his right to intimate association and Defendants are entitled to qualified immunity on this claim.

## V. CONCLUSION

Plaintiff has not demonstrated a constitutional violation to support Count III of his Complaint. Plaintiff has therefore failed to meet his burden to overcome the individual Defendants' qualified immunity defense. Moreover, because the Court has found no constitutional violation, Plaintiff cannot maintain a claim against Defendant City of Albuquerque.

Wherefore, Defendants' motion for summary judgment on Count III of Plaintiff's complaint is GRANTED, and Count III is dismissed with prejudice.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**